# BOOTH–KELLY LUMBER COMPANY *v.* UNITED STATES.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 258.  Argued May 4, 5, 1915.—Decided May 17, 1915.

Judgment of the Circuit Court of Appeal cancelling patents for timber lands on the ground of fraud affirmed, the explanations of the grantee who claimed to be a *bona fide* purchaser without notice failing to escape the effect of incontrovertible facts which showed participation in the fraud.

203 Fed. Rep. 423, affirmed.

THE facts, which involve the validity of patents to land alleged by the United States to have issued as the result of fraud in the entries, are stated in the opinion.

Mr. *A. H. Tanner,* with whom Mr. *A. C. Woodcock* and Mr. *John Van Zante* were on the brief, for appellant:

There is nothing in the Timber and Stone Act to prevent the entrymen from borrowing the money to pay the ex-

penses of making the entries and to pay the government price for the land. *United States* v. *Detroit Timber Co.*, 124 Fed. Rep. 393; *Lewis* v. *Shaw*, 70 Fed. Rep. 289, 294; *Hoover* v. *Salling*, 110 Fed. Rep. 43, 47; *United States* v. *Richards*, 149 Fed. Rep. 443; *United States* v. *Barber Lumber Co.*, 172 Fed. Rep. 948, 960; *United States* v. *Williamson*, 207 U. S. 425; *United States* v. *Biggs*, 211 U. S. 507; *S. C.*, 32 L. D. 349; *S. C.*, 34 L. D. 129; *Larson* v. *Weisbecker*, 1 L. D. 422; *Appeal of Ray*, 6 L. D. 340; *Halling* v. *Eddy*, 9 L. D. 337; *Church* v. *Adams*, 37 Oregon, 355; *Wilcox* v. *John*, 21 California, 267; *Norris* v. *Heald*, 12 Montana, 282; *James* v. *Tainter*, 15 Minnesota, 512; *Gross* v. *Hofeman*, 91 Minnesota, 4; *Fuller* v. *Hunt*, 48 Iowa, 163.

Upon making his initial filing on a timber claim the entryman may sell or agree to sell the claim, or borrow money on it, or do as he pleases with it without violating any of the provisions of the Timber and Stone Act. *United States* v. *Williamson, supra; United States* v. *Barber Lumber Co.*, 172 Fed. Rep. 948, 960; *United States* v. *Kettenbach*, 175 Fed. Rep. 463, 466.

A deed, though absolute in form, if intended as security, is a mortgage, and it may be shown to be such by parol evidence. *Peugh* v. *Davis*, 96 U. S. 332; *Brick* v. *Brick*, 98 U. S. 514; *Cabrera* v. *Bank*, 214 U. S. 224, 230; *Russell* v. *Southard*, 12 How. 139; *Hall* v. *O'Connell*, 52 Oregon, 164; *Kramer* v. *Wilson*, 49 Oregon, 333.

When the Government calls the entryman as a witness on its behalf it is bound by his testimony unless overcome by countervailing evidence. *United States* v. *Barber Lumber Co.*, 172 Fed. Rep. 948, 960; *Choctaw &c. Ry. Co.* v. *Newton*, 140 Fed. Rep. 225, 250; *United States* v. *Budd*, 144 U. S. 154.

As to the character of evidence required by a court of equity to set aside a patent attention is called to the following decisions: *United States* v. *Budd*, 144 U. S.

154, 162; *Maxwell Land Grant Case*, 121 U. S. 325, 379; *Colorado Coal Co.* v. *United States*, 123 U. S. 307, 317; *United States* v. *Marshall Mining Co.*, 129 U. S. 579, 589; *United States* v. *Stinson*, 197 U. S. 200, 204; *United States* v. *Clarke*, 200 U. S. 601, 608.

The declarations of a person after he has parted with the title to real estate are not admissible against his grantee to defeat or destroy the title. ` Dodge` v. *Freedman's Bank*, 93 U. S. 379, 383; *Phillips* v. *Laughlin*, 99 Maine, 26; *Vrooman* v. *King*, 36 N. Y. 477.

*Mr. Assistant Attorney General Knaebel*, with whom *Mr. S. W. Williams* was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by the United States for the cancellation of five patents for timber lands issued to the four individual appellants and one Jordan, all of whom subsequently conveyed the lands to the Booth-Kelly Lumber Company. The ground of the bill is that the entries were made pursuant to an understanding with the Company for the purpose of conveying the title to it, in fraud of the law. The defendants, except Jordan, answered jointly, denying the fraud, and the Company set up that it was a purchaser for value without notice. The answer was sworn to by the manager of the Company. Afterwards it was amended by agreement so as to allege that the defendants Ethel and Lucy La Raut were still the equitable owners of the land patented to them and that their warranty deeds to the Company were in fact mortgages to secure repayment of advances made to them. The bill was taken for confessed against Jordan, and both courts found for the Government as to the land conveyed by him. The Circuit Court of Appeals, reversing the decree of the Circuit Court, found for the Government as to

the other lands also and ordered a decree for the United
States.  203 Fed. Rep. 423.

The issue is purely one of fact upon matters with regard
to which the Circuit Court seems to have been prevented
from coming to the same conclusion as the Circuit Court
of Appeals rather by the presumption in favor of the
patents than by its belief in the testimony for the defence.
As both courts agreed about Jordan in accordance with
his own statement on the stand, we shall reëxamine only
the cases of the La Rauts.

The La Rauts were poor, two of them being in the em-
ployment of the Company, and they were connected by
marriage with the manager of the Company, Booth.  As
the result of an arrangement with Booth, the nature of
which is the point in controversy, by Booth's direction the
man who was looking out for the Company's timber pur-
chases reported claims for the La Rauts in the neighbor-
hood of the Company's extensive tracts.  Booth directed
Dunbar, the bookkeeper of the Company, to see to the
furnishing of the money.  The La Rauts were taken to
inspect the land, so that they might make the necessary
affidavits, but beyond that appear to have known nothing
and to have made no inquiries at any time.  The Com-
pany paid their expenses and, through their hands, the
land office fees, the cost of publication and the purchase
price—all the bills, in short.  On May 7 and 8, 1902, they
received their certificates of title and in July executed
deeds, Booth testifies, to him, certainly either to him or to
the Company.  At or about the same time each received
$100 just as Jordan did, whose claim was one of the same
group and filed at about the same time.  These deeds were
not recorded, and were destroyed; there is some indication
in the evidence that the destruction was at the time of a
Government investigation into land frauds, but the proof
is not clear.  In 1904 the patents were issued and were de-
livered to one Alley by the Land Office.  Alley secured

them at the request to John F. Kelly, vice president of the Company. The Company ever since has paid the taxes and exercised dominion over the land. In 1907 new warranty deeds were executed to the Company by the La Rauts, Ethel and Lucy receiving $25, seemingly in connection with their conveyances, and later Stephen and his wife $50, each.

Booth and Ethel La Raut, now Mrs. Lewis, meet the inference naturally to be drawn from the facts thus far stated, by testifying that it was agreed between them that Booth would get timber claims for her and the other three, carry them, and advance the money necessary until they were able to dispose of the property—which would seem to imply that they bought the land for speculation, contrary to their affidavits, but of course denies that they bought for the Company. Both Ethel and Lucy La Raut were called by the Government and both asserted that they bought for themselves, that they still owned the land, and that their deeds were executed only as security for the advances that the Company had made, and there is some corroboration of Booth as to details, but the evidence for the defendants is overborne by the whole course of what was done. A part of it is discredited by the established falsity of similar testimony in the matter of Jordan. The claims of Stephen A. La Raut and Alice La Raut his wife, are disposed of by Mrs. Applestone, daughter of Alice by a former husband, if she is believed. She says that in 1902 her mother told her that she had taken up a claim for Mr. Booth and was to get $100 and that her step-father took up his claim for the same reason, and that he said that he had received $100 also. The story is confirmed by the behavior of the parties concerned. For after Stephen La Raut and his wife had made their last deeds to the Company, when, according to Booth, Stephen wanted to go to Canada and to dispose of his land, and applied to Booth, Booth turned him over to Kelly, gave him no information as to the value of the

claims and let him sell them for fifty dollars in addition to the hundred dollars that each had received in 1902, although they clearly were worth a great deal more. Booth's actual conduct is inconsistent with his having entertained a benevolent scheme, and the sum paid is hardly reconcilable with Stephen and his wife being owners of the land.

If the defendants' case fails as to these two claims it hardly can succeed as to the others, for according to them all were taken under a single arrangement for all. And there is further evidence that Booth's account cannot be accepted. We will not encumber the reports with lengthy statement of details, but apart from evidence of other fraudulent claims in the same group with these, the books of the Company which were under Booth's eye tell a different story from his. The ledger showed no names, but the journal account under each name charges them with $400, the price of the land, and $100 which each received (with a small additional item for Stephen) and then on July 31, 1902, charges the whole $500 to stumpage, the general account of the Company for the purchase of land. There the accounts end, and thereafter the lands were carried on the Company's land account. The actual expenses other than the foregoing never were charged to them at all, but all, including the later payments of $25 and $50 went without specification into the stumpage account. There are attempts to explain all this by alleged oral statements that Booth held himself responsible, as there is a lame effort also to get rid of the original sworn answer, the inconsistencies of which with the subsequent testimony we have not stated at length. We think it enough to say that the explanations fail to escape the effect of the incontrovertible facts.

*Decree affirmed.*

Mr. Justice McReynolds took no part in the consideration and decision of this case.