## ROWN v. BRAKE TESTING EQUIPMENT CORPORATION et al. *

### No. 5939.

Circuit Court of Appeals, Ninth Circuit.
Feb. 17, 1930.

*Rehearing denied April 8, 1930.

Ira J. Wilson and Wilson, Dowell, Mc-Canna & Rehm, all of Chicago, Ill., and John H. Miller and A. W. Boyken, both of San Francisco, Cal., for appellant.

Chas. E. Townsend and A. E. Cooley, both of San Francisco, Cal., for appellee Brake Testing Corporation.

Leonard S. Lyon, of Los Angeles, Cal., for appellee Cowdery Brake Tester Organization.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge.

Below, the appellees and the appellant were, respectively, plaintiffs and defendant, and herein they will be so designated. One of the plaintiffs is the owner of Brennan patent, No. 1,264,770, and the other is a licensee thereunder. The defendant, who, in his automobile shop at San Francisco, uses a brake-testing device, known as the "Jumbo," and manufactured by the Price-Hollister Company of Rockford, Ill., is sued upon the ground that he thus infringes the patent. The only claim presently involved is No. 1, which the lower court held valid and infringed. It is as follows:

"A brake tester comprising means engaging a wheel element for rotating a wheel against the action of its brake and means associated therewith for indicating the resistance of the brake, together with means for temporarily supporting the wheel during the operation of said brake tester."

The patent issued April 30, 1918, upon an application filed April 24, 1916. In his specifications the patentee declared that his "invention relates to a brake-testing device, particularly designed for testing the brakes of an automobile," and that its object "is to provide a simple and inexpensive device for the purpose which may be readily applied either in a garage or elsewhere to determine whether or not the brakes are in proper working condition." Pointing out the danger of operating cars with imperfect brakes, particularly in urban communities, he asserted

that the only known means of discovery of defects was by observation in the actual operation of the car upon the road. It was particularly desirable, he stated, "that a portable device be provided for instant test use, since a car may behave quite differently when taken stagnant in a garage, from the manner in which it behaves after it has been driven for a while."

In his drawings he exhibits the device in six different forms. In the first form it is a very simple one, consisting of a hand lever similar to a cant hook, with one end adapted to engage the wheel hub, and about a spoke's length from this end provided with a swinging hook attached to the lever by means of an intermediate spring fitted with a device for registering the degree of pressure applied. In operation, the wheel is driven upon a low platform where it rests upon cylindrical rollers, which revolve freely as the wheel is rotated. One end of the lever is placed upon the hub of the wheel, the hook is engaged with the outer end of a spoke, and to rotate the wheel the operator lifts upon the outer end of the lever. With the brake applied, its efficiency is measured and registered by the spring and attached gage. It will at once be seen that with the wheel thus relieved of ground friction an operator can approximate the same result by lifting directly upon a spoke and estimating the pressure applied. Functionally, the lever serves only to elongate the spoke and thus increase the operator's power; and for his estimate of the force applied is substituted the more accurate mechanical gage.

In the second form the fulcrum end of the lever is made to rest upon an independent pedestal instead of upon the hub, and, in the third, the gage spring is differently located. In figure 4, instead of the spring gage, there is a pneumatic pressure chamber. Obviously these differences are not highly material. Figures 7 and 8, without modification of essential principles, show forms adapted for application to wheels with wire spokes and of the solid type. They exhibit no differentiating inventive novelty.

The form exhibited in figures 5 and 6, the patentee states, is particularly adapted for use upon heavy trucks, his description of it being substantially as follows: The wheel to be tested is run up the end incline of a supporting block or platform and positioned upon a roller bearing plate carried by the block. The surface of the plate is preferably corrugated to avoid slipping of the wheel thereon. Pivoted in the body of

the block is the testing lever, fitted with a gage similar to that already described, the stem of which is secured to the outer end of a subsidiary lever, the opposite end of which is pivotally connected with the roller plate. As the testing lever is lifted or lowered, its tendency is to move the roller bearing plate backward or forward, thus rotating the wheel a short distance against the resistance of the applied brake; and such resistance is measured by the gage.

The problem of providing braking equipment for the modern automobile is not a simple one, for both efficiency and provision for safety are requisite. Brakes may be reasonably effective quickly to slow down or stop a rapidly moving car, but their application may impair steering control or be attended with other danger. Generally, cars are provided with four-wheel brakes, and obviously maladjustment as between the two front wheels will directly affect the steering; and to some extent the same consideration applies to the rear wheels. Opinions may differ upon the question whether as between the rear and the front wheels the brakes should be equally powerful or should apply simultaneously, but, as between the front wheels or the rear wheels, it is agreed that not only should the brakes be of the same capacity, but that at any instant and under any given degree of applied power they should be equally effective. And at any given time there should be a predetermined relation between the efficient power of the front and of the rear brakes. Moreover, for reasons well understood, a dependable test and accurate adjustment can be made only under conditions substantially the same as those which actually prevail upon the road with the wheels bearing the weight of the car and making complete revolutions.

Thus to state the problem is at once to raise the question of how far Brennan contributed to its solution. Not only is the means suggested crude, but his conception was wholly inadequate. If patentable novelty be assumed, he provided only a small portable device, of some value, particularly in cases of emergency. Without it the operator could, upon raising the wheel from the ground by means of a common jack, and then lifting on the rim to turn the wheel against the applied brake, make a rough estimate of brake action. As already suggested, Brennan's test lever increases the operator's power by elongating the lever naturally afforded by the wheel itself, his meter is more accurate than the operator's "feel," and the roller block or platform may gener-

ally be preferable to a jack. But plainly he provided no means for, nor apparently did he have any conception of, a test and adjustment under the conditions actually prevailing on the road, to meet which the brakes are necessarily employed. When we remember that, owing to the overhanging fender, the possible stroke of his test lever is very short, it will be seen how inadequate must be the possible "slip" of the brake band upon the drum for a dependable test, especially for purposes of synchronization. And in attempting such a test there is scarcely room or time to apply the brake while the drum is in motion, so that with the brake first set the operator must overcome the factor differentiating friction at rest from friction in motion.

Furthermore, of two brakes which are equally effective when applied with full force, one may grab more quickly than the other, or, when partially applied, one may develop more frictional resistance than the other. It would hardly be contended that with the Brennan device there would be any certainty of detecting such disparities or making adjustments therefor. It is recognized that, owing to imperfect or worn wheel bearings or axle deflection under load, a brake band, perfectly adjusted when the car is on jacks, may, when the car is let down and put into operation, become eccentric to the drum and hence out of adjustment. Indeed, there is nothing in the claims, the specifications, or drawings to suggest that the patentee had in mind at all the effect of badly adjusted brakes in respect of steering or skidding. Whether because at that time —before the advent of four-wheel brakes— the need of equalization was not acutely felt, or for other reasons, Brennan apparently was without appreciation of that phase of the problem, and it cannot be said that his device is reasonably adapted to its solution. If he had any conception of this factor of the problem, he does not disclose it, for it is to be inferred from his specifications that he conceived of the jack and the block with rollers as equivalent means to lift the wheel out of frictional contact with the ground. True, he distinguishes "a stagnant condition" from one which arises after the car has been "driven for a while." But that scarcely reaches the point; for in making this test he could use either the jack or his block and rollers under either condition. The structure disclosed in figures 5 and 6 would seem to be even less serviceable than the one shown in figure 1. In using the latter, the operator can, by a series of adjustments of the

hook, and of lever movements, effect a complete revolution of the wheel. But, in using the former, the thrust of the roller table by which the wheel must be actuated is very short, and repeated strokes of the lever would operate only to give the wheel an oscillatory motion through a small arc, and a complete turn would be impossible. Indeed, we are convinced this structure is so nearly inoperable that it is without practical utility.

█ Not only upon the face of it would the Brennan device appear to be inadequate, but the deduction is fortified by experience. As already stated, the patent was applied for in April, 1916. Brennan himself testified that in February and March (apparently 1915), he built three of his devices, but ceased to use them after about two months' trial, and from that time up to 1927, when he sold his patent to one of the plaintiffs, to his knowledge there was no brake tester like his in use anywhere. True, nonuse is not conclusive of inutility, but, where it extends over a considerable length of time, it is a circumstance to be considered in the light of such explanation as may be made for failure of use. Under the patent a license was issued to the Ray-Bestos Company, but there is no proof that any device was ever sold thereunder. It is also true that the present owner, the plaintiff Brake Testing Equipment Corporation, issued a license to its coplaintiff Cowdrey Brake Tester Organization, but this was not until February 20, 1928, only three days before the bill herein was filed. The machines of neither of these concerns are within the description or drawings of the Brennan patent, and it is interesting to note that the Cowdrey license provides that all royalties thereunder be impounded pending this litigation, to the end that, if the Brennan patent be declared invalid or insufficient in scope to cover the defendant's device, the licensee is to be relieved of all obligations to pay royalties. And, inasmuch as the Cowdrey Company, for a long time prior to the license engaged in the manufacture of testing machines, is here a plaintiff asserting the validity and the broad scope of the Brennan patent, it is further interesting to note that in its 1926 Sales Manual it had this to say:

"Several hand lever operated machines, all of about the same mechanical principle, have recently appeared upon the market. We experimented with and abandoned this method several years ago. Our reasons for abandoning the hand lever type were as follows:

"Unless the wheel is continuously rotated, a confusion of static friction with dynamic friction renders readings valueless.

"Hand lever machines are not powerful enough to test brakes at maximum capacity. If brakes are equalized at 25% or 50% of capacity, it does not follow at all that they are equalized at maximum capacity.

"Eccentric drums cannot be detected unless the wheel is continuously rotated at slow speed, which cannot be done with the hand lever method."

The inadequacy of a hand lever device like Brennan's is further explained and emphasized in the catalogue issued by this plaintiff and also in certain patents under which its machines were put out.

As a distinct defense, defendant sets up what is known in the record as the Seppman brake tester, a device which, though unpatented, it contends invalidates the claim in suit because it was within the knowledge of many people, and was in public use more than two years prior to Brennan's application. As a legal basis for the contention, it invokes section 4886, R. S. U. S. (35 USCA § 31) which, among other things, provides that an applicant can procure a patent only for improvements "not known or used by others in this country, before his invention or discovery thereof," and "not in public use or on sale in this country for more than two years prior to his application." We do not stop to elaborate upon the application of the rule thus established, for it cannot be seriously controverted that, if the facts are such as defendant asserts them to be, the Seppman device constitutes a complete defense. It will suffice to cite Walker on Patents (6th Ed.) pp. 137, 139; Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Brush v. Condit, 132 U. S. 39, 10 S. Ct. 1, 33 L. Ed. 251; Jenner v. Bowen (C. C. A.) 139 F. 556; Virginia-Carolina P. P. Co. v. Benthall Mach. Co. (C. C. A.) 241 F. 89; Standard Automatic M. Co. v. Karl Keifer M. Co. (D. C.) 18 F.(2d) 326, 331; Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610.

█ Both sides recognize that in making out such a defense the party offering it is under the heavy burden of producing clear and satisfactory proofs, with reasonable doubts resolved against it. Sipp Elec. & Mach. Co. v. Atwood-Morrison Co. (C. C. A.) 142 F. 149.

█ All the testimony upon the issue having been taken out of the presence of the trial court, by deposition, the presumption in sup-

port of findings based upon conflicting testimony in court does not prevail. U. S. v. Booth-Kelly L. Co. (9th C. C. A.) 203 F. 423, 429; Id., 237 U. S. 481, 35 S. Ct. 659, 59 L. Ed. 1058.

Defendant produced in court what it asserts is the actual Seppman tester and jack, which it further contends were used by Seppman and under his direction for ten years, from 1912 forward, in testing the brakes upon a very large number of automobiles. Seppman used a jack to raise and support the wheel, and then rotated it against the applied brake with a hand lever device fitted with a meter, which, in its patentable aspect, is substantially identical with the Brennan device first hereinbefore described. Both in letter and substance the claim in suit reads upon it. It is strikingly similar in form, operates in substantially the same manner, and effects substantially the same results. In short, if the device is authentic and was publicly used during the period alleged, there is scarcely room for doubt that it anticipated the tester in suit.

From Seppman's testimony it appears that all of his life he lived on a farm near Mankato, Minn., and, being mechanically inclined, spent considerable of his time about his father's blacksmith shop, giving his attention to some extent at least to automobile mechanics. Thus engaged, he became interested in the problem of accurately setting the brakes upon automobiles. In 1911 he contrived a hand lever for rotating the wheel, and this, in 1912, he perfected and to it added a meter attachment for gaging the frictional resistance of the applied brake. The device and a jack, introduced as exhibits, the testimony tends strongly to show, are the identical instruments so contrived and used. With them in that year he tested the brakes upon several cars in the neighborhood, in some cases, at least, making a small charge for the service. This work he continued to do from time to time as there was demand, always using only this tester, until 1922, when he completed an improved device designed for the same purpose. During the period, he testified, he thus made several hundred tests. His use of the tester was always open and public, and to numerous persons he explained its construction and mode of operation.

His testimony is circumstantial to a high degree, and of certain apparently inconsistent positions taken by himself, but more particularly by his associates, in recent transactions having to do with enterprises for the promotion of later inventions, he gives a not unreasonable explanation. In view of the marked inventive capacity and zeal he subsequently exhibited, there is nothing inherently improbable in the claim that he devised and used the tool. If his story is substantially untrue, it is willfully false, and constitutes perjury of the most flagrant type; it cannot be accounted for upon the theory of trick of memory or innocent mistake. But in point of character he was not impeached, he is a man of family with a fixed abode, and apparently he stands well in his community. It is true that he is interested directly or indirectly in the outcome of this suit, but he is strongly corroborated in respect to the substantial features of his story by the testimony of eleven credible witnesses who lived in the neighborhood during the period in question, no one of whom has any interest whatsoever. Circumstantially they testified that they saw the tester, some of them many times, in and about the Seppman garage or blacksmith shop, saw it used, and understood its mode of operation and action. They testify that the exhibits are the identical tester and jack, or are of very similar appearance, and they fix dates generally by reference to writings or records, or to events of such character and significance that they are likely to be remembered. Not unnaturally, they may magnify the number of times they saw the instruments and witnessed their use, but that they saw them in the open possession of Seppman and observed him make public use of them for testing purposes from 1912 forward we entertain no doubt. To reject such testimony taken as a whole, or to decline to believe it, would, in effect, be to nullify the provision of the statute, by exacting an impossible standard of evidence. The testimony is not contradicted, is not inherently improbable, and would, we think, be accepted as satisfactory and convincing, if not wholly conclusive, in any other kind of case, criminal or civil.

But, if we ignore the "Seppman device," and assume patentable novelty in the Brennan tool—a point touching which there is room for grave doubt—we do not think plaintiff shows infringement. Our reasons may be briefly stated. In its most comprehensive form, the "Jumbo" brake tester is a ponderous machine adapted simultaneously to determine, with respect to the weight of the car, the efficiency of the brakes upon all four wheels. The car is driven upon the machine, and so positioned that each wheel is

supported upon a motor driven friction roller, in conjunction with an idler roller. The former is mounted in a rocking cradle in such manner that, when it is put in motion, it may "creep" under the wheel. In operation, the wheels are continuously rotated by means of these friction rollers and at any speed subject to the will of the operator. The brakes are applied to the rotating wheels, and, when the resistance upon a wheel exceeds the thrust of the weight of the car upon the friction roller, the latter tends to creep under the wheel in a direction opposite to its rotation. The amount of such creepage depends upon both the brake resistance and the weight of the car, and its extent is registered by a gage. The relative efficiency of the four brakes is shown by the gage, and adjustments may be made to equalize them and give them the action desired.

It will thus appear that with this machine tests may be made under conditions closely approximating those encountered in the actual operation of the car on the road. The brake is applied while the wheel is in motion, so that the measure is of the dynamic rather than of the static friction; there is much fuller opportunity to make a thorough test, in that the wheel makes a complete revolution instead of through only a small arc; and, it being within the power of the operator to control the speed at will and to apply different degrees of brake pressure, disparities in both the time and the degree of brake action can readily be detected.

Without going into a detailed discussion of the question whether under a broad and liberal construction of the Brennan claim we may find in the "Jumbo" the exact equivalents, in combination, of the elements of the Brennan device, we are clearly of the opinion that, construed in the light of the drawings and specifications and the limitations to which Brennan submitted in the proceedings in the Patent Office, the claim does not read upon the Jumbo machine. Of course, we attach no significance to disparity in size as such.

Upon the other hand, if the claim be given the broad scope for which plaintiffs contend, we think that, in view of the prior art, aside from the Seppman tester, the claim must be held void. Brennan started with the common knowledge that brake action could be observed by rotating the car wheels against brake friction disassociated from other friction, and to obtain such requisite condition the wheel must have frictionless support.

The jack, at least, was a well-known instrumentality for such purpose. That a wheel so relieved of ground friction may be rotated by a tangential application of force upon an outward element thereof is also common knowledge, as is the principle of the lever and of various devices in daily use for measuring the degree of force exerted. In respect to these elements or factors considered separately, there was no "discovery" or "invention," though, of course, there may be novelty in the combination. Against his claim as originally formulated, there was cited in the Patent Office the Stephens patent, No. 1,080,937, exhibiting a lever engaging with a casing and a dynamometer for indicating resistance to a turning movement by means of a lever; also the German patent, No. 129,791, showing a dynamometer wrench; and the Foote patent, No. 434,181, disclosing a support for the wheel with revolving members permitting the wheel to rotate freely. In rulings rejecting the claim because of these prior patents, Brennan acquiesced by amending it. When the amendments are considered in the light of these patents, and together with the specifications and drawings, we are inclined to think that the words "means engaging a wheel element" imply a positive engagement with some part of the wheel, that is, a nonslip engagement, and should not be extended to the defendant's creeping friction roller.

As tending to confirm the view that the Brennan device must be restricted to a narrow range of equivalents, without further discussion we may refer to other prior art, namely: Brake testing device shown and described in 1894, at pages 154 to 158 of volume 28 of Proceedings Master Car Builders Association and in University of Illinois Bulletin, May 23, 1910; tension registering wrench covered by patent to Walker, No. 414,615, November 5, 1889; testing device, particularly for automobiles, covered by patent to Brush, No. 750,749, January 26, 1904; testing device covered by patent to Spellman, No. 976,705, November 22, 1910; testing apparatus covered by patent to Beall, No. 1,-044,121, November 12, 1912; testing jack covered by patent to Wingo, No. 1,029,163, June 11, 1912.

To recapitulate, our conclusions are that:

(1) Brennan's device is not essentially different from the Seppman, which in public use and knowledge anticipated it approximately three years.

(2) Aside from Seppman, Brennan's conception was of a combination in a primitive device of known means for the exercise of known functions for determining the frictional resistance of a brake upon a single wheel. It did not extend to, nor was the device designed for, "brake equalization" as such, an end which is of the highest importance in modern cars, equipped as they are with four-wheel brakes, and which the "Jumbo" device is well adapted to accomplish. Nor does the Brennan patent disclose any conception of the importance of testing brake action with the wheels under load and making complete revolutions, that is, under actual operating conditions on the road.

(3) In view of the proceedings in the Patent Office and the state of the prior art, the Brennan device, if patentable at all, must be limited to a narrow range of equivalents, and, so limited, it is not infringed by the "Jumbo."

Reversed and remanded, with directions to dismiss the bill.