**EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES v. IRELAN.**

No. 9759.

Circuit Court of Appeals, Ninth Circuit.

Nov. 10, 1941.

James A. Poore and James A. Poore, Jr., both of Butte, Mont., for appellant.

Sherman W. Smith and Victor H. Fall, both of Helena, Mont., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

In two policies, of which appellees were the beneficiaries, appellant insured the life of Mrs. Clara Dambley. The policies provided for payment of double their face amount in the event of death of the insured occurring directly "by external, violent and purely accidental means". Death by self-destruction, whether sane or insane, was by definition excluded from this feature of the insurance coverage.

On September 30, 1939 the insured died by drowning in Puget Sound. Appellant paid the face amounts owing on the policies but declined to pay the double indemnities. Appellees sued, alleging death by accidental drowning. In its answer appellant admitted the drowning but denied accident. The court, after trying the case without a jury, made a finding of accidental death and gave judgment for the beneficiaries.

The evidence presents no material conflict. The insured, who appears to have been in her 59th year, was living with Alex Dambley as her husband in a cottage near Sequim, Washington. One week before her death she had made an unsuccessful attempt at suicide, the circumstances of which we will first relate. Her husband, who worked for a nearby gun club, testified that on that day he found the insured on the bed in the cottage with a bathrobe cord around her neck. She was bleeding from the mouth. She said, "I want to die. Let me alone." Doctor Jessup was called and a note was found on the table, in the insured's handwriting, which read "Goodbye Alex, I am losing my mind." The insured later promised Dambley "that she was not going to do that any more." Her husband nevertheless took the precaution of hiding a bottle of iodine which had been in the kitchen. Insured was "quite nervous". "She worried about a lot of things that she had really no grounds to worry about." She had told her husband about certain troubles she had had with her sisters. About two months previously she had told him that if anything should happen to her she wanted a Mrs. Dick to have certain of her personal things. Within the same period she had remarked that she had a notion to end it all.

Dr. Jessup testified that on his arrival at the cottage he found the insured lying on the bed in a cyanotic condition, with blood oozing from her ears and nose and marked ecchymosis about the neck. He observed a bathrobe cord at the foot of the bed and a note on the table reading "Goodbye Alex, I am going to end it all", or words to that effect. The markedly injected and bloodshot condition of the eyes, noted by the witness, indicated suffocation and was such as would continue for about two weeks. Insured told the doctor that she was tired of life and if she failed this time she would try again. She was very definite about wanting to do away with herself and she said something about some sisters or relatives beating her out of some property, and she could not stand it.

Mrs. Scott, a neighbor, testified that when she visited the insured the day after the attempt the insured told her she was "doomed". Mrs. Dambley had told her many times how nervous she was and she was not well. She always felt she was in trouble. Mrs. Dick testified that she visited the insured on the day after the attempted strangling, was told by her that she had tried to kill herself. She did not seem to be very happy and had been in the habit of weeping. About two days prior to the drowning this witness called on the insured and found her weeping and afraid, said she thought a car had come to take her away to an asylum.

The cottage in which the insured lived was about one-half mile from the shore of Puget Sound. A week after the attempt just related Mrs. Dambley left home in the afternoon, presumably to visit Mrs. Dick who lived on the beach near Jamestown, although a daughter of Mrs. Dick had notified insured that her mother would not be home that day. When last seen alive insured was crossing a field proceeding in the direction of the beach. There is no boating or bathing place there. She was accompanied by her small dog on a leash. Late that evening her body was found on the beach where it had been left by the receding tide. She had died by drowning. Aside from minor bruises and some cuts on the inside of her left wrist there was no sign of injury, and there was no evidence of foul play.

The beach at this point is quite shallow, with a sandy base, and there is a runoff of the tide for a long distance. The sand slopes from the line of high tide for some 50 feet, where it levels off. At the latter point the water at full tide is about four feet, perhaps more, in depth. High tide on the day of the woman's death was at approximately four o'clock in the afternoon. The day was cold and foggy with some

464

wind. The searchers first discovered the dog tied to a fence and insured's coat on a log not far distant from where the body lay. Except for the coat the woman was fully if thinly clad. The plainly discernible prints of her shoes were seen to proceed along the shore for a ways, circling a time or two before turning to enter the water; then "there were no more tracks."

The foregoing evidence was introduced by appellant. All of it was in the form of depositions taken out of the presence of the court. In rebuttal appellees called a medical witness who was asked whether, in his opnion, it was possible for an able-bodied woman between fifty and sixty years of age, presumably in possession of all her faculties, intentionally to drown herself on a sandy, gently sloping beach, in two to four feet of water. The opinion expressed in response was that there could be no intentional drowning under those conditions in the absence of other circumstances, such as a considerable tidal current.

The conceded fact that the insured died by drowning gave rise to the presumption that her death was accidental. What we have to consider on the appeal is whether the presumption—a disputable one under the Montana law—was overcome by the evidence tending to prove that the unfortunate woman was in fact a suicide. Since all testimony bearing on the circumstances antecedent to and surrounding her death was by deposition, the finding of accidental death, while it is justly entitled to consideration, has not the weight we would otherwise be obliged to concede to it. This court is in as good a position as the trial court was to appraise the evidence and we have the burden of doing that. Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, was intended to accord with the decisions on the scope of the review in federal equity practice; and, as is well known, in the federal courts where the testimony in equity[1] or admiralty[2] cases is by deposition the reviewing court gives slight weight to the findings.

In Montana a disputable presumption has the effect of evidence and is satisfactory if not contradicted. State ex rel. Brown v. District Court, 72 Mont. 213, 218, 232 P. 201. When the evidence preponderates over a disputable presumption the presumption disappears. Monaghan v. Standard Motor Co., 96 Mont. 165, 173, 29 P.2d 378. And see Nichols v. New York Life Insurance Co., 88 Mont. 132, 292 P. 253; In re Wray's Estate, 93 Mont. 525, 19 P.2d 1051; Renland v. First National Bank, 90 Mont. 424, 4 P.2d 488. In its latest expression on the subject, Story Gold Dredging Co. v. Wilson, 106 Mont. 166, 176, 76 P.2d 73, 78, the court said:

"We have said of a disputable presumption, in the case of Monaghan v. Standard Motor Co., 96 Mont. 165, 29 P.2d 378, 379: 'Such a presumption is successfully controverted when proof to the contrary overcomes it. By proof that satisfactorily overcomes it, it is meant that which is sufficient to sustain the affirmative of an issue—a preponderance of the evidence. Therefore, when the evidence preponderates against a disputable presumption, it fades away in the face of the contrary facts. [citing cases]. The fact, however that the testimony is uncontradicted is not sufficient to overcome a disputable presumption and thereby to warrant a directed verdict, where the inferences to be drawn from the facts and circumstances are open to different conclusions by reasonable men. Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228.' Until a disputable presumption is overcome by evidence, a question of fact is raised between it and the evidence tending to destroy the force of the presumption."

In our view, the evidence produced here so clearly points to suicide as to overcome the presumption of accident. We need not inquire whether, as appellant contends, the opinion testimony of appellees' medical witness ought to have been excluded. The evidentiary value of the opinion is so inconsiderable as to render it

[1] Paraffine Companies v. McEverlast, Inc., 9 Cir., 84 F.2d 335, 339; Rown v. Brake Testing Equipment Corp., 9 Cir., 38 F.2d 220, 223; United States v. Booth-Kelly Co., 9 Cir., 203 F. 423, 429; Id., 237 U.S. 481, 35 S.Ct. 659, 59 L.Ed. 1058; Grove Laboratories v. Brewer & Co., 1 Cir., 103 F.2d 175, 178; Stewart v. Ganey, 5 Cir., 116 F.2d 1010, 1012, 1013; Kycoga Land Co. v. Kentucky River Coal Corp., 6 Cir., 110 F.2d 894, 896; Nashua Mfg. Co. v. Berenzweig, 7 Cir., 39 F.2d 896, 897; United States v. Corporation of President, etc., 10 Cir., 101 F.2d 156, 160; Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275, 279; State Farm Mut. Auto Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 413, 415. And see cases cited in O'Brien Manual of Federal Appellate Procedure (1941) p. 191 et seq.

[2] O'Brien, Manual of Appellate Procedure (1941) pp. 111–114, and cases cited.

worthless for all practical purposes; and the fact that it was given orally does not require the reviewing court to accept it as adding to the weight of the finding below.

Reversed.