## OSWEGO FALLS CORPORATION v. AMERICAN SEAL–KAP CORPORATION.

Civil Action No. 2269.

District Court, E. D. New York.

April 6, 1946.

340

William J. Barnes, of New York City, (Henry R. Ashton, of New York City, and D. Emmett Thompson, of Syracuse, N. Y., of counsel), for plaintiff.

Victor D. Borst and N. L. Leek, both of New York City, for defendant.

BYERS, District Judge.

This is a patent cause in which the usual issues of validity and infringement require decision.

The plaintiff owns Wright and Pierce Patents Nos. 1,857,073, 1,857,075 and 1,884,-952, to be called for convenience herein the 073, 075 and 952 Patents, respectively. Each is entitled "Hood Capping Container", and the dates are:

073 Application September 26, 1925; date May 3, 1932

075 Application November 2, 1925; date May 3, 1932

952 Application May 9, 1929; date Oct. 25, 1932

The noun "Container" in the title is misleading, for in each instance a machine is described for affixing covers or caps to bottles.

The art to which the 073 Patent is addressed is that "of applying and securing hood cap disks of paper or substantially equivalent material to containers to cover and enclose the mouth portions thereof". It is said that "an object of the invention is to speed up the operation of applying sheet fibrous material hood caps having flexible flaring skirts to and securing them on the heads of upright containers such as bottle heads having exterior rims under which the flexible skirts are contracted and pressed for securing". A further object is "to provide improved apparatus for hood capping containers with temporarily moldable hood cap disks and for holding the annular portions of said disks drawn downwardly and contracted inwardly on the bottle heads, in contracted secured form until set".

There is no specific mention of milk or cream bottles in the specifications or claims; perhaps an oblique reference could be implied in the suggestion on page 2, lines 68 et seq., to the back wall and its adaptability to the accommodation of quart, pint and half-pint bottles; true, some of the drawings illustrate bottle heads like those we see containing milk; there is nothing, however, to exclude such bottles if used to hold any fluid, whether for sustenance or delectation.

The 075 Patent is said to relate "to the method of and apparatus for preparing and for applying hood caps to bottle heads while such caps are in a condition to be molded under the bottle head rims, and for pre-treating said caps to reduce the same to such condition". An object of the invention is said to be "to provide efficient and improved apparatus for and method of treating hood caps for container heads (hood caps that embody a binder rendering the cap skirts or the securing portions of the cap skirts hard or stiff at atmospheric temperatures and soft or moldable at higher temperatures) to render such caps moldable, and to apply such moldable caps to the heads of containers for ultimate securing thereon by molding and permitting the cap skirts to set under the exterior rims or securing shoulders of such heads".

Again there is no specific reference to milk and cream bottles elsewhere in the Patent.

The 952 Patent is for improvements in machinery for hood capping containers and the improvements will be the subject of an attempt at explanation below. Presently it is to be observed that there is no restriction of the mechanisms depicted to

operation in connection with milk bottles. It is apparent that the patentees did not intend thus to limit their disclosures to mechanical structures designed to meet the requirements known to exist in connection with the problems peculiar to the purveying of milk and cream in individual containers. So much being evident, it will be understood that contentions later to be examined, to the effect that the art of capping milk and cream bottles is a thing apart, and that resort may not be had to capping devices for containers of other substances on the question of patentable invention, should be considered in contrast to the failure of these patentees to proclaim any such limited a concept in their specifications.

It is to be understood that the mechanisms here under consideration had nothing to do with the plug which was placed inside the neck of the milk bottle, above the contents, and which obviously afforded no protection to the pouring edge.

That there were problems peculiar to the proper distribution of milk and cream in bottles, at the dates of filing admits of no dispute; the recognition thereof goes back at least to 1904, the date of the Patent to Dennison, No. 772,557, for a paper cap.

■ The top of a milk bottle is called the pouring edge—for obvious reasons—and the necessity for protecting it against contamination is too evident to admit of discussion. Such protection presented a broadly recognized requirement for many years prior to 1925. This recognition was common to the public health authorities, and to all engaged in the industry of purveying milk in bottles for human consumption. The plaintiff's patents are entitled to be adjudged as to validity, in the light of the foregoing recital, with the important reservation that their contribution consisted in capping a number of bottles almost simultaneously, instead of singly according to earlier practise, and reference will be made below to prior patents as the discussion may seem to require.

The Disclosures of the Patents in Suit

073

The objects of the invention have been alluded to and the disclosure may be briefly described as follows: A bottle capping mechanism is shown, comprising:

(a) A heating element in which nested hood cap disks, having flexible flaring skirts, are heated, and from which they descend for release one at a time, upon the top of a filled bottle.

(b) Mechanical means for conveying filled bottles to the position under the heater, from which the heated caps so descend, including a finger for removing the lowest cap so that it rests upon the bottle top, the skirts flaring as above stated; they are long enough to encompass the ridge or ledge on the outside of the bottle neck, and to fold into final position directly beneath it. The said conveying means move the bottle thus equipped to the next element.

(c) A planetary clamping mechanism for pressing the flaring skirts by lateral compression actuated by springs, into close engagement; and to hold the skirts together long enough to cause them to become set or fixed in that condition, thus completing the cap securing operation.

To accomplish this result on several bottles in rapid succession, a number, six for instance, of contracting heads are held in equal circular relation to each other in a horizontal revolving disk, so that as a given bottle, being capped, entered the cap securing head, it was held by that device after the cap skirts had been forced into engagement, by the contracting action of that head, for one revolution of the disk, at the completion of which the bottle was released by the head, and mechanically caused (i. e. by the same conveying means) to emerge from beneath the head, and to move into the procession of bottles thus made ready for discharge.

The time consumed by the revolution of the disk carrying the contracting heads was that required for the setting of the skirts into fixed engagement, namely, the cooling period.

It has been deemed sufficient to explain this disclosure in abbreviated and non-technical form, since for the moment it is unnecessary to discuss the precise mechanical means employed to accomplish a given step in the desired operation.

Simplified drawings constitute Exhibits 2 A and 2 B and may be consulted for convenience, rather than the elaborate recitals of the specifications and patent drawings, for a superficial but presently adequate understanding of the conception of the patentees, and the invention disclosed.

A machine for performing the capping operation, with the moldable pre-formed caps, i. e., not flat disks, upon a group of

bottles carrying heated caps, in succession instead of one at a time, was the important disclosure, as the patentees understood the situation. Obviously time is gained, if six bottles are having their caps secured at the same time, rather than singly, although the bottles emerge completely capped one at a time, because of the interval required as to each, to complete the cooling and setting period. It will be realized that the conveying mechanism accomplished the purpose of moving one bottle under the heater to receive a cap, while its immediate predecessor was moved into position to be raised into the cap contracting head where it is held for a revolution of the disk or plate carrying the six contracting heads; and the conveying mechanism also carries the bottle whose cap has cooled and set, after release from the eldest capping head so to speak, into the line of bottles finally equipped for discharge.

In short the mechanism accomplishes the progressive handling of a plurality of bottle capping operations, one step at a time.

It is necessary to pause sufficiently to explain that while the patent teaches nothing about the caps as such, the repeated references to moldable caps in some claims which plaintiff has stated are now withdrawn, and in the specifications, give rise to one branch of the controversy. Moldable caps are those which are composed of material which requires heating in order that the skirts may cohere when pressed together and held in engagement until they cool and become set in that position. In the 073 patent, it seems that the entire cap was heated to accomplish that result—not merely the skirts.

·Such caps are thought by the defendant to be distinguishable from those to the skirts of which there has first been applied a strip of adhesive material which, when heated, becomes soft and "tacky", causing the skirts to stick together when they have been mechanically pressed into engagement for the desired purpose. In such caps, the constituent material is not heat treated, but only the band of adhesive substance which is applied as stated.

It is further to be remembered that the plaintiff's caps as illustrated and described in this patent, when they entered the heater, were pre-formed, that is to say, the skirts depended from the center portion, and the blank was therefore not a flat disk, but a cap, partly formed and ready to be heated

and to receive the folding pressure of the skirt contracting head mechanism.

These subjects are now alluded to for clarity, rather than comment.

### 075

This patent is addressed particularly to supplying a vertical heating element with cold caps, one at a time, which element contains a series of shelves upon which the caps descend in turn; those shelves are equally spaced, and move in endless chain through the heater; at the completion by each cap of its appointed travel (not quite a full lap) it slides down an exit chute, skirts down, in an oblique position so as to be ready for an oncoming bottle which receives and carries the cap, loosely seated, to a cap skirt contracting mechanism, not described but indicated as "a gathering and compressing implement or tool" to "radially and circumferentially compress the hot skirts against the container necks and mold the same thereto beneath the container head rims" (for instance, the exterior ridge on a milk bottle neck) "and thus hold the skirts until they set in rigid securing form".

The mechanism is clearly shown in simplified drawing, Exhibit 3 A, and embodies means to move the bottles successively into a position to receive the heated caps, and thereafter; and to actuate the cold cap receiving device, and the intermittent progression of the shelves or ledges carrying the caps to be heated, in an elliptical course through the heater, to the exit chute.

Incidentally means are disclosed as each bottle moves toward its receiving position, to interrupt the supply of cold caps to the heater, if one bottle happens to be missing (through breakage) from the procession; in that case, the empty support will actuate a halt in the supply of cold caps to the heater, which continues until the void in the file has been closed by the presence of a bottle destined to receive a cap. Unless such a break in the procession of bottles occurs, a cold cap enters the heater every time a bottle, intended ultimately to receive a heated cap, passes the mechanism for detecting a possible break or gap in the line of such bottles. This is called the bottle detector.

It will be realized that, as to these two patents, a supply of heated caps must be ready in advance of the arrival of the first bottle at the cap receiving station, which means that a number of caps must be heated in advance, corresponding to the number of

bottles which will come to the cap receiving station, before the arrival of that particular cap which entered the heater when the first bottle passed the bottle detector above referred to.

## 952

This is for a mechanism likewise embodying a magazine holding cold caps, the lowest of which is picked off by a mechanical finger and caused to fall—top down—through a chute to a horizontal cap conveyer under the chute, containing apertures into which the cap fits with the edges of the skirts holding it in position; the conveyer horizontally rotates caps through the heater; at the expiration of the heating period, each heated cap is pushed downwardly by the action of a punchlike element thrusting against the central portion of the cap; the latter travels down through a tunnel where it is turned and comes to rest, skirt edge down, horizontally upon a platform, from which it is swept into a position between the bottle which is to receive the cap, and the cap skirt contracting means or head; the bottle is then caused to move vertically upward, and thus to engage the cap; then the movement continues and the bottle neck and cap move into the cap skirt contracting head. The latter, which somewhat resembles the similar element in the 073 Patent, secures the skirts by radial annular pressure, and continues to hold the bottle and cap during the required setting period which is accomplished during the rotation of the circular member of which the contracting head is a part. When that rotation has been accomplished, the bottle is released from engagement and moves in the procession of capped bottles which have been released.

This patent teaches two new features:

(a) Continuous as distinguished from intermittent or step by step progress, whereby the output of the machine is markedly increased, and easier control of coordination between the several operations and their respective mechanisms is brought about.

(b) What is called a cap call is provided, namely, mechanical means whereby an entering bottle actuates a picker which causes the proximate cold cap to enter the heater, and there remain for the required heating interval so that it will meet and rest loosely upon the top of the bottle which thus caused it to start through the heater; that is, the travel time of the bottle to its cap receiving position corresponds to the heating period of the cap.

If there is a gap in the line of bottles, no cap will be called until the next bottle arrives to make such a requisition.

Thus there is no advance supply of caps awaiting the arrival of the first bottle, as in the case of the earlier patents.

Before discussing the questions of validity and infringement it is necessary to dispose of an effort by the plaintiff, made with the submission of its brief and stated in a letter later addressed to the Court, to avoid a decision on the validity of four claims under the first patent and five under the second, by conceding non-infringement thereof. The language is: "Accordingly, plaintiff hereby concedes that claims 4, 10, 22 and 35 of the first Wright patent in suit, and claims 17, 18, 19, 24 and 26 of the second Wright patent in suit are not infringed by defendant, and plaintiff hereby agrees to a dismissal as to these withdrawn claims, on the merits."

To the extent indicated, the question of infringement is no longer in the case.

The plaintiff relies upon Larson v. General Motors Corporation, 2 Cir., 134 F. 2d 450, to establish that validity as to those claims is likewise removed from the controversy.

The defendant argues that, having pleaded a counterclaim in which it prays that invalidity of the plaintiff's patents be decreed, it may not be thus summarily deprived of an adjudication of that branch of the case. In preparation for trial the defendant has taken and submitted a considerable volume of testimony and exhibits, and was not apprised until nearly or quite two months after final hearing that the plaintiff's cause would be diluted to the extent stated; thus there is substantial merit in the defendant's assertion that it should not be deprived of its present day in court on the question of validity as to these particular claims.

The Larson case supra involved an unusual situation in that the issue of validity arising in the first cause of action for patent infringement, was also controlling in the second cause which asserted appropriation by the defendant of plaintiff's alleged invention; as to that, a jury trial was appropriate, and hence the appellate court held that it was an abuse of discretion for the trial court, in disposing of the first cause

without a jury, to decide the question of validity.

No such complication is here present. Since it is recognized that there is a judicial discretion reposing in the District Court touching this subject, reviewable on appeal, that discretion will be exercised presently in favor of defendant's position for the following reasons: These claims involve the inclusion of the word "moldable" in describing the caps that are heated, and otherwise manipulated as described; whether that is a limitation upon the mechanical disclosure as a whole, is involved in the contentions relied upon by the defendant to defeat patentable invention; the delay on the part of the plaintiff in limiting its cause of action in the respects indicated may have put the defendant to considerable expense in the preparation of its case, which should not go for naught. I cannot see that it was only the "moldable" cap aspect of the claims that caused the defendant to offer elaborate testimony concerning other machines, but that seems to be an insufficient reason to decline to decide the questions of validity at defendant's request.

The case of Lackner Co. v. Quehl Sign Co., 6 Cir., 145 F.2d 932, is of persuasive if not controlling effect to sustain the defendant's position, on the grounds of public policy.

This decision will proceed therefore upon the theory that defendant's counterclaim asserting invalidity requires this Court to dispose of that issue in respect of which the plaintiff has now withdrawn its assertions of infringement concerning the claims of the first and second patents to which reference has been made.

### Validity

This subject is presented in two aspects:

(a) Prior patents which are asserted by the defendant to foreclose patentable invention with respect to the disclosures of the patents sued upon.

(b) Prior use as disclosed in machines said to have been constructed, operated and sold by American Machine & Foundry Co. (not a party) which for convenience will be referred to as the 8—4 and 8—7 machines. As to the former, none was sold, and of the latter about thirty were put upon the market and ran for a time with less than dubious success. It is argued that the 8—7 machine was an improved version of the 8—4, embodying its essential characteristics.

The dates relied upon are:

*June 12, 1923,* date of job order based on designs covered by order of December 1, 1922.

*October, 1924,* 8—4 machine sent to Borden plant, Brooklyn, for test performance, but delivery is more clearly fixed as of November 13, 1924, which is the date of invoice (Ex.M.M.).

These dates are to be contrasted with the filing dates of 073 (September 26, 1925) and 075 (November 2, 1925).

Considering these contentions in the order stated, it becomes necessary to make reference to the claims and the supporting specifications for the sake of clarity in defining the invention as disclosed.

It is to be remembered that, speaking generally, these patents cover mechanisms for performing progressively and speedily a number of operations which could have been and probably were done singly, bottle by bottle, at a high cost of operation.

It may also be convenient to here state, that there is no prior patent in evidence which purports to disclose a combination of mechanical elements which so functioned in unison as to place paper or other like caps upon milk bottle tops, in condition to be conformed to the contour of the bottle top, fold and compress them into final form, and hold them in that state long enough to have the caps become set.

Reliance is had upon parts of the disclosures of other patents, upon the familiar principle that a combination, to be valid in the patent sense, must achieve a new and important result in a substantially new way.

### 073

Claims 4, 10, 22, 24, 26, 28 and 35 are deemed to be in litigation. Of these, 10, 22 and 35 specify progressive capping which has been spoken of above, and the caps are "moldable" within 10 and 22. The quoted word introduces the controversy which has been alluded to, for the practical reason that the defendant's machine heats a cap for later folding and holding in place, made of paper, having a flaring pleated or scored skirt containing a strip or band of applied adhesive material, which becomes sticky or tacky on being heated; the cap in that condition is folded or compressed into final position and there held during the cooling period, by mechanism which is the equivalent of that taught by the plaintiff.

If the claims containing the word "moldable", in describing the caps, can be restricted therefore to caps made of a material which admits of the desired conformation when heated, and later setting during the cooling period, one element of possible infringement will be avoided. Also validity will be impaired in view of the 8—4 and 8—7 machines, if anticipation is thereby established (a subject for later consideration).

It seems desirable therefore to put this question at rest, if that be possible, in this branch of the discussion.

It is clear that the court is dealing with a machine and not a cap. As the defendant's brief states it in referring to the Jaeger patent, "The caps are no part of the mechanism".

If it could be seen that the process of feeding and heating caps, and then placing them upon bottles, and causing them thereafter to be contracted as to their skirts and so held during the cooling or setting period, required one type of heater for so-called "moldable" or fiber caps, and another for fiber or paper caps having only a limited portion of the skirt put into the desired condition; or if any other one of the mechanical elements could not function as well with one type of cap as with the other, the word "moldable" would be read as a limitation upon the plaintiff's disclosure of a machine which is a combination of non-patentable (so far as this record discloses) elements. Such is not the showing, so far as the skirts themselves are concerned.

The defendant's witnesses Goodwin's and Gore's testimony has not been overlooked. It is persuasive that if the defendant's entire cap were to be exposed to heat, it could not be successfully conformed to final position on the bottle, and they therefore say that the defendant's cap is not molded.

This exposes the question of whether "moldable", as used in these and claims in the 075 patent, really means that the entire cap had to be heated in order that the skirts might be put into condition for conformation and setting. If the claims and specifications so disclose, they must be read in that sense; if they do not, the court is free so to interpret the expressions employed as seems best adapted to an understanding of the disclosure.

It must be apparent that ultimate engagement of the skirts of the caps was the object sought to be attained. It would be strange indeed if that could be accomplished only by heating the entire cap, since the influence of a heated or softened condition in the center would seem to be remote from the area of ultimate cohesion. The specifications indicate that it is the flexible flaring skirts which are to be secured (page 1, lines 16 and 25). That the skirts are rendered self-securing (page 2, line 9 et seq., and lines 28, 38, and 43).

While the binder resides in the cap disks as an element of the fiber of which they are made (page 3, line 100 etc.) and the disks are rendered moldable through the fusion of the binder, it is for the purpose of hood capping.

Nothing is said to indicate that the fusion of so much of the binder as is in the center of the disk is required in order to render the skirts self-securing, and the claims with reference to the word "moldable", so far as this court is concerned, will be construed as though the heating and rendering moldable of the entire cap was a mere incident of that treatment which was intended to effect the capacity of the skirts only to become self-securing.

I do not therefore regard the term "moldable", in these or later claims to be examined, as restricting the disclosure made to a machine adapted to treat only caps composed of fiber or the like, impregnated throughout with a binder element.

Claim 10 is typical also of claims 22 and 35. It is for apparatus to

1. Render sheet fibrous, etc., cap disks moldable by heat, and capping bottles therewith; including supply means of such disks.

2. Successively bring the disks and bottle heads together.

3. Gather the cap skirt portions on successive bottle heads, and contract them circumferentially, and so hold them until set.

4. Advance the bottles during the cap setting period.

For greater certainty the claim may be quoted:

"10. Apparatus for rendering sheet fibrous material binder-carrying hood cap disks moldable by heat and hood capping bottles therewith; including means for rendering a supply consisting of a multiplicity of such disks temporarily moldable by heat; means for successively bringing together moldable disks from said supply and the heads of bottles supported in upright position; a succession of mechanisms for gathering the skirt portions of the hot moldable disks on successive bottle heads

and contracting the same circumferentially inwardly and radially under the bottle head rims and thus holding the same in secured hood cap form until set by cooling; and means for advancing the hood capped bottles in upright position with said mechanisms contracting the caps on the heads thereof while said hood caps are setting to stiff securing condition."

Claim 4 is for apparatus for applying paper material hood caps, *the skirts of which carry a binder rendering the caps self-securing* (italics supplied), to and securing the same on bottle mouths; comprising:

1. A bottle feedway.

2. A hood cap receiving station therein, and means there for applying such hood caps with flaring skirts in moldable condition.

3. A hood cap securing station along said way, and means there for molding the cap skirt to the bottle mouth and tightly and annularly compressing it to the bottle under the bottle rim and thus gripping said skirt until set in stiff securing form.

These claims fairly disclose so much of the invention as treats of moldable caps, and will be the subject of comment presently in connection with defendant's argument that the 8—4 and 8—7 machines establish prior use of moldable caps. For the moment that subject will be laid aside in order to discuss the relationship of prior patents to this one.

Claims 24, 26 and 28 are those as to which plaintiff urges that the question of validity be confined.

Claim 24 is for apparatus in combination:

1. Means to advance upright bottles in succession from a cap receiving station past a skirt contracting station to a secured capped bottle discharge station.

2. Means to maintain a multiplicity of sheet fibrous caps with flexible flaring skirts, and supply means as described.

3. Cap holding means, skirt down, to enable bottles to receive them.

4. "Several hood cap skirt contracting mechanisms movable forward in succession with the bottles from said skirt contracting station to said bottle discharge station (see 1), and each (said mechanism) receiving a bottle head loosely carrying a flaring skirted hood cap at said skirt contracting station for contracting the flexible skirt for securing under the bottle head rim and adapted to discharge the bottle carrying a secured hood cap at said discharge station."

Claim 26 is for apparatus for hood capping bottles, including means:

1. A magazine holding such caps and advancing them in succession.

2. To bring caps and bottle heads together at cap receiving station, the skirt of caps down.

3. To advance bottles thus equipped in succession to cap contracting station.

4. Means to clamp said skirts annularly and radially around bottle neck for retention "in securing form".

Claim 28 is for such apparatus, including means:

1. To provide upright successive bottles with such loose caps having skirts, etc.

2. A succession of compressing clamps which expand and contract annularly to receive a bottle carrying such a cap when expanded, and to contract so as to compress the cap skirts, and to later expand so as to release a capped bottle and receive a new one.

3. To advance the said clamps in endless circuit.

The patents named by defendant's expert, Mr. Trotter, as closest to 073 in point of disclosure are Westlake #1,252,377 and Jaeger #1,749,347; he had stated that there was no one patent that could apply to all the features of this patent.

The first named was for a bottle capping and sealing machine, designed to cap one bottle singly; it was granted January 1, 1918, on application filed February 28, 1916. No type of cap is specified, but it was doubtless designed to treat a flat (Rec. p. 1624) cap which was softened and rendered moldable by heat (See Westlake #1,137,820 dated May 5, 1915). The elements of the mechanism are: (a) a magazine holding a supply of cold caps; (b) a heater to render them moldable; and (c) a crimping mechanism for molding and crimping the caps while soft and moldable, and holding them until they were cooled and set.

Means are shown to remove a cap from a stack (magazine) and deliver it to a mechanism called the disk ring which carries it into the heater, and later therefrom (the cap then being soft and moldable) to a position under a crimping head and over a bottle, upon which it is crimped, molded and held until it is cool or set. The crimping mechanism is not shown but is said to

accord with that of Bradley #1,238,486 assigned to Westlake.

Fortunately that mechanism calls for no present exposition, as it is not the subject of present controversy.

Since this Westlake patent was for a single bottle capping, there is lacking, in comparison with the 073 patent, the elements for progressive capping which is the heart of the 073 patent, and teaches capping of bottles without stopping their continuous movement to and from the capping agency. Since Westlake did not employ a cap with a flaring skirt, his mechanism was not designed for their treatment, but that is not presently deemed to be a critical difference.

Standing alone, this patent did not teach the invention of 073, but it definitely circumscribed the territory open for appropriation in the field of bottle capping machinery.

Defendant contends that progressive capping was old when 073 was granted, and relies mainly on Jaeger #1,749,347 as above stated.

That patent was for a multiple-head sealing machine, granted March 4, 1930 (one year and ten months prior to 073) on application filed April 17, 1922.

The extent to which Jaeger may be deemed to have anticipated 073 in the matter of progressive capping is probably the sensitive nerve of this aspect of the controversy. He taught a machine for capping glass jars and the like with a metal cap, capable of such sealing "wherein the sealing operation is performed while the package is traveling. In view of the fact that a number of sealing members are arranged to be successively operated it follows that a plurality of sealing operations may be occurring in different stages at the same time and without interrupting the progress of packages passing through the machine since the sealing operation occurs while the package is moving."

The foregoing, taken from the opening statement, would aptly designate this feature of the 073 patent, the appropriate changes being made to designate hood capping of bottles, with caps of the kind referred to by Wright and Pierce.

The disclosure is of a machine comprising:

a. A rotating conveyer or platform operating in a horizontal plane, which is held in position by vertical posts. Glass jars are carried by that conveyer successively to a cap applying station and then by aid of a star-wheel to

b. A support or elevator which moves the container under a sealing head which

(1) Spins the metal cap into engagement with the top of the jar, and

(2) Carries the jar around while that operation takes place to an exit star-wheel which functions so as to move the now sealed jar off into the procession of those ahead which have undergone the same treatment.

The patentee describes the second above subdivision thus: "A plurality of sealing heads are mounted directly over the platform, one over each table (bottle support or elevator above) and are constructed to rotate in unity with the platform so that when packages are placed upon the tables and the tables are raised the sealing heads become effective to seal the packages during one revolution of the platform and the multiple sealing head frame."

This mounting of the sealing heads and their successive operation, as the glass jars loosely holding caps are presented thereto, may be compared to the rotary head depicted in Fig. 2 of the 073 patent. The descriptive matter will be found at page 7, lines 110 et seq. After stating that a bottle head is held in the clamping or gripping member, the disk containing a plurality of such devices "is rotated a step forward carrying the bottle with it, and bringing another mouth 22 over the bottle cap securing station to receive a bottle. The disk is thus rotated forward step by step, and during each stop at the cap securing station should grasp and hold a bottle and carry the same forward from said station. The disk will thus carry forward a number of bottles held suspended therefrom by the gripping blades fitting the bottle necks under the bottle rims or heads. The cap skirt of each bottle will be thus held in molded secured condition while the disk approximately makes a complete revolution, during which time the securing or binder carrying portion of the skirt has more than ample time to set in its permanent stiff securing condition. * * * The bottles after being carried around by the disk, are successively discharged from the disk at the point desired, * * *."

The patentees state in effect (page 8, line 21 et seq.) that speed is the principal object to be attained by their in-

348

vention, thus agreeing with Jaeger who points out the same consideration in his opening paragraph (page 1, line 4 et seq.).

The problem dealt with by Jaeger was simpler than in the case of the 073 patent, in that he had no occasion to provide a medium for the progressive heating of his caps to render them conformable to the containers, nor a cooling period to be synchronized with the revolution of the disk carrying the sealing heads. In his device, the spinning operation that resulted in securing the metal caps to glass jars was probably about as rapid as the compressing operation of the clamping heads of the 073 patent, although there is no testimony on the point except that Mr. Trotter says (page 1433) that the sealing operation is gradually performed and involves pushing the cap down on top of the container, and the pressing of the cap into engagement.

Perhaps that means that it takes longer to fix the metal cap than it does to compress the skirts of the fiber cap. However, once the metal cap is in place, the container is ready for discharge, while in the case of the bottles capped according to 073 there is a waiting period for cooling and setting which had to be reckoned with and provided for in designing the mechanism of the patent in suit. The required heating and cooling periods constituted added complexity, and distinguishes the problems of the respective inventors; whether it changed the nature rather than the scope of the inventive concepts poses a question to which a ready answer does not suggest itself at this stage of study.

Progressive capping as taught by Buhles #1,227,244 (granted May 22, 1917) adds nothing to the Jaeger disclosure for present purposes, and seems to resemble the latter closely as to progressive capping and the mechanism rendering that possible where metal caps are employed.

It now becomes necessary to consider what the Art knew about heating caps progressively for so dispensing them.

Weber et al. #938,529, granted November 2, 1909, for Can-Cover-Coating Machine is for mechanism to apply to the seaming flanges of can heads a rubber cement in heavy liquid form, and to convey them into a heating and drying element in which the solvent elements are expelled from the sealing mixture, and the latter solidifies, so that the cap emerges with a ring of sealing compound embedded in the flange, roughly comparable to a rubber gasket. Thus equipped, it is capable of effecting hermetically closed sealing. These patentees state (page 1, line 81 et seq.): "To increase the capacity of the machine, a plurality of can cover carriers are mounted in the drying chamber and a plurality of rotating can cover holders, can cover feed chutes and packing composition discharge nozzles are employed."

Since the heating and drying require time, it is evident that there is a progressive process involved from the entry of a freshly treated cap, to its emergence in condition for application as a sealing device, and the provision for accomplishing that result upon a plurality of caps admitted in succession (36 seem to be indicated in Fig. 2) necessarily teaches successive heating thereof. Obviously it is not important to the subject of progressive heating that Weber's are not paper or fiber caps having skirts.

The heating chamber of Weber et al. closely resembles that element in the 075 patent in design and operation, to which patent we shall come eventually.

The lack of means to affix the metal cap of Weber et al. is likewise irrelevant to the principle of progressive heating.

Thompson #890,250, granted June 9, 1908, teaches clearly and succinctly the progressive heating of coils of wire and the like in annealing furnaces. The principle is unmistakable.

Clark #1,134,031, granted March 30, 1915, for Bottle-Cap-Assembling Machine, is for a machine which inserts adhesive disks and then cork disks into metal caps for bottles, first heating the adhesive disks, and pressing the cork disks into engagement after the same are placed upon the adhesive disks, and cooling the cap as so assembled. Certainly the cooling is progressive and perhaps the heating is, although as to that there may be dispute; the caps ready for pressing are received on a circular holder, where the pressing takes place and the cooling ensues.

Buhles #1,271,847 and Valerius #888,-770 are not thought to greatly illuminate this branch of the case. Heating of cans in the first, and of paraffin covered plugs in the second, may be progressive in an incidental sense, but not because the devices were designed to accomplish that purpose as an end in itself.

Was the same Art involved in Westlake #1,252,377 and Jaeger #1,749,347 (pro-

gressive capping) and Weber et al. #938,-529 and Clark #1,134,031 (progressive heating) as that to which the plaintiff's patent 073 is addressed? The defendant's affirmative answer is buttressed by the decision of the Court of Customs and Patent Appeals in Re Rundell, 55 F.2d 450, 19 C.C.A., Patents, 932, which seems persuasive to this court.

No reason is perceived for segregating machines for progressively heating and capping milk bottles, from the capping and sealing of beverage or food containers in general, which can be stated in convincing form.

The necessity for protecting from contamination the pouring lip or edge is common alike to bottles containing milk, and bottles or other containers from which other · liquids for human consumption are poured, and the problems encountered in providing safe but removable tops would seem to be present in connection with all such dispensing media; to accomplish the desired result speedily of course does not affect the nature of the problem. If this is true, the Art to be consulted embraces the said Westlake, Jaeger, Weber et al. and Thompson patents.

The assembly of suitable mechanisms to accomplish progressive heating and capping, in place of the single operation shown by Westlake, would seem to have enlisted the insight of one who understood the requirements, and the skill to integrate known mechanical elements into an operating composite; that is, it would seem that such progressive heating and capping was not a new result, in view of Jaeger, and that it was not accomplished (according to the disclosure of this 073 patent) in a substantially new way.

The critical questions in connection with all these claims are: (a) Is the mechanism so circumscribed by reference to fibrous hood caps having flaring skirts as to indicate patentable invention over Jaeger and Westlake? and (b) Is the clamping device specified in 28 sufficient to support a like burden, having in mind the Marshall #964,-926 device?

As to the first, it will be recalled that the caps are not disclosed as an element of the invention. There are reasons in the record to vindicate the wisdom of that reticence. So far as the heating device is concerned, there is no apparent reason why metal caps having skirts (Jaeger) cannot be heated in the same kind of receptacle as fibrous caps. True, the clamping or fastening means required for their conformation would be destroyed by the Jaeger mechanism. But Marshall's clamping means is similar to that of the 073, and in any case the latter is not claimed to be a patentable element in itself.

As to the flaring skirts which are not present in the Westlake caps, again it is the machine and not the caps which is the subject of the patent. It is not now perceived that patentable invention lies in the mere inclusion of the words describing the kind of cap which the 073 patent was designed to manipulate, nor in the language which indicates that the caps are compressed into position and so held during the cooling period by "a succession of hood cap skirt gathering and compressing annular expanding and contracting clamps", etc., which means are taught by Marshall #964,926.

The group of patents above referred to is deemed to embrace all elements of the claims of this patent now in litigation, and consequently to effectually deprive them of the status of patentable invention, since no new and important result is achieved in a substantially new way.

## 075

The claims deemed to be in suit are 12, 17, 18, 19, 24 and 26.

The patentable invention as claimed is for a machine for delivering fibrous caps of the same pre-formed type having flaring skirts from a nested supply to a vertical heater which resembles that of Weber et al. #938,529, one at a time; in that element they travel in an elliptical course while the skirts are heated, up one side and down the other, and each cap falls down a chute with skirts down, in a diagonal position into the path of an oncoming bottle, by which it is carried, as has been stated, into the cap securing element. The latter is not claimed, but such a one as is taught in 073 is stated to be appropriate. In other words, the disclosure is limited to the supply of such caps to the heating element, the heat treatment thereof, and rendering a treated cap available to an oncoming bottle.

The discussion of the 073 patent renders unnecessary any repetition of much that has been stated. The claims other than 12 all have to do with "moldable" caps and plaintiff desires to withdraw such claims for both purposes of the case, while de-

fendant insists on a decision as to their validity.

Claim 12 is:

"12. Apparatus for applying non-metallic flexible sheet material hood caps having flaring skirts, to container heads for contraction to secured form under the container head rims; said apparatus including

(a) "a magazine for a stack of nested non-metallic sheet material flaring-skirted hood caps, said magazine having an outlet for successively dispensing said caps, said stack adapted to advance in said magazine toward said outlet;

(b) "a cap holder adapted to successively receive said hood caps from said magazine and detachably hold each cap with its open side down and its flexible skirt depending in the path of movement of a container head whereby such container head enters and removes said cap from the holder with the cap centered on the container head with its flaring flexible skirt depending around said head;

(c) "a feeder for successively removing and stripping said skirted hood caps downwardly from said magazine outlet; and

(d) "conveyer means for successively delivering said caps from said feeder to said holder."

As to progressive heating, the references cited by defendant are again Westlake #1,137,820, Weber et al. #938,529 and additionally Clark #1,445,296; for reasons heretofore given, it is apparent that nothing essentially new was taught by this 075 patent, any more than by 073.

The argument against Westlake is:

(a) That it is adapted to dispense flat caps, not those having flaring skirts. This really goes to the design of the clamping element, not to the heating element and the supply of caps thereto. That is, the problem of design is directed to detail, not principle.

(b) That the cap holder so disposed and equipped as to hold each cap "open side down", etc., is such an innovation over Westlake as to disclose patentable invention.

■ That argument is not persuasive since the shape of the cap, which is not part of the claim, required a method for dispensing which would be best adapted to accomplish the end result of causing it to occupy a position on the bottle neck which would enable the contracting element to function.

The skill thereby requisitioned was that of an adapter of the Weber et al. teaching to the obvious requirements of a fibrous cap having flaring skirts, not that of an inventor of some new thing.

Nor is it deemed appropriate to repeat here what has been said about the difference between the heat treatment of metal caps or tops (Weber et al.) and that applied to fibrous caps, since the underlying requirements are the same, and the variation in mechanisms is not a matter of principle.

Clark #1,445,296 is new to this part of the argument. It is for Hopper For Capping Machines, granted February 13, 1923. The important feature is that metal caps having flaring skirts are so led into position to await oncoming bottles, that the skirts are down and so come to rest on the bottle top when the latter moves into position to cause the cap to fall, so that the bottle and cap are ready to enter the cap securing mechanism. That is, it is a cap reversal element, which puts the cap into position to be picked off by the approaching bottle.

It will be recalled that cap reversal is accomplished in the 075 heater by the course of travel pursued by the cap holding shelves. It would be difficult to describe that as a triumph of mechanical engineering, but it is required in order that the bottle in either case shall receive a cap in proper position for fastening into place. Means for picking off caps by approaching containers are involved in Jaeger #1,571,269, granted February 2, 1926, application filed April 20, 1920, prior by five years or so to the application date of 075.

Claim 12 is deemed not to involve patentable invention, in view of the cited Art.

■ For reasons heretofore stated as to 073, the claims of 075 involving "moldable" caps (those other than 12) are deemed to have been anticipated in all material respects with reference to progressive heating.

952

The claims in suit are 1, 2, 3, 5 and 25, and will be considered in two groups, 1, 2 and 25, and 3 and 5. Of the first, claim 2 is thought to embrace the others:

"2. In hood capping machinery, in combination,

(a) "a heating oven;

(b) "constantly moving mechanism for carrying and simultaneously exposing to

the heat of said oven a plurality of paper material hood cap disks provided with a binder to render them moldable while constantly advancing a procession of said disks and successively discharging moldable disks for delivery at a hood capping station;

(c) "means for delivering hood cap disks one at a time from a supply to said mechanism for replenishing the supply of moldable disks and for ultimate delivery at said hood capping station to meet an advancing container for which said disk is predestined;

(d) "mechanism for advancing a succession of containers to be hood capped successively at said hood capping station in timed relation to the disk delivering operation of said means, whereby each container and a moldable hood cap disk will be brought together at the hood capping station; and

(e) "a container detector controlling the disk delivering operation of said means to prevent delivery of a disk to said first mechanism when no container to receive said disk after being rendered moldable, is advancing in its proper order in said succession of containers."

It will be seen that the foregoing disclose:

1. The heating element of constantly moving mechanism for a plurality of caps, while constantly advancing a procession of them and successively discharging them when heated at a capping station.

The foregoing includes means to supply the caps singly, for the above purpose, so that a given container will meet the one cap which it started through the heater.

2. Mechanism to advance a succession of containers—bottles perhaps—to be hood capped at the capping station *in timed relation* to the cap supply means, so that each container and a heated cap will meet at the capping station.

3. A detector which controls the supply of caps to the heater to prevent the entry therein of a cap if no container (bottle) will be in place to receive a heated cap.

As has been said, the departures from the earlier patents consist of (a) the teaching of a constantly moving, instead of a progressive heating mechanism that moved one step at a time; and (b) provision called predestination, the starting of a given cap on its heating tour, by the bottle which is to receive that cap. The detector is a necessary incident, because if a bottle is missing in the procession, no cap will be required by the empty space.

The constant movement in the heater of course is for the purpose of greater speed in the capping operation, and its successful introduction into the machine disclosed by this patent is not denied by the defendant. Nor is the predestination device questioned as to its efficacy.

The defense is that both elements are to be found in prior patents, reliance being had on Westlake #1,137,820 above discussed, Rundell #1,958,769, and Youngdahl #2,026,856.

Since the first named does not teach either progressive or constant operation, it requires no further comment in connection with that feature of 952.

The defendant cites the Youngdahl patent in connection with the predetermination element, and with reason:

The date of issue is January 7, 1936, on application filed May 21, 1928, renewed February 24, 1933. Since the first filing date was prior to that of the 952 by nearly a year, it is to be deemed prior art. Western States Machine Co. v. S.S. Hepworth Co., 2 Cir., 147 F.2d 345, at page 348. This is to say, it was known to the inventor and the patent examiner (which might be thought to clothe it with a somewhat esoteric status in a capitulation of "the sum of knowledge" Picard v. United Aircraft Corporation, infra. [128 F.2d 635]

It is for Timing and Safety Device for Bottle Conveyers. It relates to capping machines and is applicable particularly to the said Rundell patent.

The specification recites: "In the best constructions also, there is provided in a machine of this type for capping containers and having a capping station, charging means (i. e. that which presents the bottles for capping) for delivering containers to said station, cap feeding mechanism for delivering caps to the station corresponding to each one of said containers, and means controlling said mechanism to deliver a cap to the station only when said charging means delivers the corresponding container to the station."

The defendant's expert, Mr. Trotter, testified that "the bottle and the cap which that particular bottle released will meet in the turret"—namely, the capping element. That testimony was not contradicted and is therefore deemed to establish that so

much of the specification as has been quoted is in fact embodied in the structure disclosed in the patent, and that it is adequate to accomplish the proclaimed purpose.

 Thus anticipation of the predestination feature of 952 is deemed to have been demonstrated.

The continuous or constant movement of the heater mechanism, as distinguished from the step by step progress of the 073 and 075 disclosures, is not present in the Youngdahl structure, if the testimony has been understood; it is to the effect that the 8—7 machine embodied the Youngdahl disclosure, and in reference to claim 1 of this 952 patent, Mr. Trotter was asked if the 8—7 included all the matters therein stated, and his answer was: "It had everything except the constantly rotating means (i. e. the action of the heater). Instead of a constantly rotating means that head in the 8—7 machine had means that was moved one step at a time in constant succession. The movements were all exactly the same and there was no break in the time of those movements. It was a constant intermittent movement."

Since this must be deemed to be true therefore of the Youngdahl machine, the latter in that respect did not anticipate the 952.

The defendant argues, however, that it did not constitute patentable invention to provide mechanical means to substitute continuous for the step by step movement, since no new mechanical principle was invoked to render the change effective; reliance is had upon Thompson #890,250 above referred to, in which progressive heating is clearly revealed. The device of that patent is for heating coils of wire, and annealing them successively, and the explanation of the operation given by Mr. Trotter is neither questioned nor contradicted. The movement of the coils through the heating and annealing chambers is uninterrupted, as is the movement of the caps through the heating chamber of the 952 patent, and the only reason for denying to Thompson an effective status in this case would be that it does not deal with sealing or capping devices, but there is no more justification for disregarding it as to continuous movement through the heater, than for progressive heating.

Certainly it is of persuasive effect to the extent that it teaches constant uninterrupted movement of heat treated articles through a heater, and robs that concept of patentable novelty as a principle of the mechanical operation of such an element in a larger combination.

If this is not a sufficient reason for resort to the Thompson patent, there remains to consider whether, if it had not been cited, the mere substitution of continuous for step by step progress, as a new question, would lead to a different result. With temerity appropriate to a merely theoretical and untutored approach to an intensely practical subject, I cannot avoid the conviction that the change was one of mechanical progress merely, an inevitable step in the effort to attain greater speed in operation, and did not rise to the level of patentable invention.

 Turning to claims 3 and 5, it seems that discussion is required only with respect to that element of the latter which reads: "and a feeder for successively delivering cold hood cap disks to said conveyer (i. e. the conveyer in the heater) in timed relation to the travel thereof, and without retarding the continuous advance of the conveyer".

The "timed relation" here disclosed is to be distinguished from that of claim 2 quoted above, which has to do with the rate of advance of the bottles to the capping station, which is likewise in "timed relation" to the disk (cold cap) delivery operation.

The mounting of the capping devices in circular form constitutes one element, and the circular heater, above that, constitutes another; in the language of the witness Hughes "they are all geared together and if the bottles are coming through fast the heater is going fast".

It would seem that the form of construction adopted (Fig. 7 of the patent) renders that result inevitable, for apparently simultaneous rotation about shaft 7 is common to these elements; on page 3 at line 47 it is stated that the carrier (of the caps) "rotates on a vertical axis alined with the vertical axis of said chamber 4" (the heating chamber) and at line 70, "the rotor 6, is composed of a circular horizontal plate or disk, constantly driven by and keyed to a central vertical rotary drive shaft 7", etc.

The gearing of the cap supply to shaft 7 is explained on page 4, line 8 et seq., and is illustrated in Fig. 1.

The mechanical association which brings about the "timed relations" seems not to be itself claimed as patentable invention,

and while the problems of design seem to have been successfully solved, the concept as such does not appear to have been asserted as something new, unless I have failed to read the specifications and claims correctly. Nothing to the contrary of what is here stated appears in the plaintiff's briefs.

Defendant points out that a timed relation between the supply of elements to be heat treated, and the heating thereof, is also taught in the said Thompson patent #890,250, in which there is a moving or traveling conveyer in the heating and annealing element, with which the feeding element is mechanically associated by a chain and sprocket whereby a timed relation is established; that is, speeding up one necessarily does the same thing to the other. The principle would seem to be too clear for argument, and presumably the time element (the period required for heating) is common to Thompson and to the 952, and it would seem that it must be equally critical to both, although annealing wire and rendering caps moldable are essentially different tasks. The problems of these patentees were of course more complex than Thompson's, for once his coils had been annealed, his end result was accomplished, while here the supply of cold caps, the heat treatment, and the subsequent capping of containers, etc., as shown, constituted a series of accomplishments that was not perfected in a brief time, nor as the result of hit or miss experimentation. It seems rather to have been the result of carefully conducted and intelligently directed efforts to make use of all available mechanical skill in the assembly of units and their coordination into a composite whole of great utility and value. It is distinctly in advance of anything shown in any one or even two patents cited against it. The difficulty which I experience is in according to the invention, as disclosed, such a unique position, as compared with the teachings of the art, as would establish for it the status of patentable invention, within the stringent requirements now deemed to be in the public interest in such matters.

The result is new, only in that the progressive heating and capping of containers is more speedily and therefore more economically accomplished than was possible under the patents to Westlake, Jaeger, and Youngdahl. This is a matter of pace, not novelty.

There is nothing substantially new in the way that the result has been accomplished, if the prior patents which have been discussed are reasonably well understood as to their disclosures.

## Anticipation by Prior Use

It is necessary to examine this subject upon the theory that thus far the cause has been incorrectly reasoned.

This branch of the case is free from factual conflict, and argument is made only with reference to the conclusions to be drawn from the evidence.

Westlake, whose early patent has been referred to, went to the American Machine & Foundry Company (to be called A.M.F.) late in 1922 with a request for a mechanical design of a machine called Westlake Sanative Sealer. The order was prosecuted and during 1923 was continued with such effect that a machine was built during that year, which in operable form (October or November of 1924 according to Youngdahl) was delivered to the plant of the Borden Company in Brooklyn for demonstration. That was the 8—4 machine which is depicted in the series of photographs bearing Exhibit No. 36 a–h, inclusive.

It comprises:

(a) A 4-stack magazine of cold caps;

(b) A heater to which those caps are successively fed and in which they are rendered soft or moldable;

(c) A turret structure carrying a group of 8 capping heads, and

(d) A conveyer of bottles to the latter, where bottles successively receive hot caps, which are crimped to the bottle necks successively. The conveyer moves the capped bottles out in succession after the cooling period; during that interval the bottles are held in the crimping heads.

All elements function in proper timed relation, one to the other, in step by step progression; that is, the movements are not continuous.

Each bottle is held by a crimping head while the turret revolves during the cooling period, at the end of which the bottle is released by the crimping head, for discharge.

Also included is a device to arrest the entry of a cold cap into the heater in case a bottle is missing in the line of bottles approaching the cap receiving station.

Thus the unpatented 8—4 machine combined the elements of the 075 disclosure,

354

with differences in form rather than function.

The 8—4 machine was adapted to and did—albeit falteringly, imperfectly and with repeated lapses in performance—accomplish after a fashion the progressive heating of moldable caps, and the progressive application thereof to bottles.

This machine was designed to treat a flat or nearly flat cap, of laminated structure containing five layers of paper of like constituency, bound together by a rosin and clay compound, which softened when heated, rendering the cap moldable, and in that condition it was subjected to the action of the crimping heads; these were intricate devices composed of thirty or more vertical fingerlike members held in a circle, so constructed and disposed that, as the head descended upon the heated cap resting on the bottle top, the fingers creased the latter; and then under the impulse of springs acting laterally against the bottom of the fingers, the lower portion of the cap was pressed inwardly and folded upon itself; when cooled, the cap was set, and then the crimping head was raised and the said springs were necessarily released so that the fingers would no longer engage the caps.

It was the form and nature of the caps that gave rise to many of the obstacles that were encountered in the operation of this machine, and of its successor, the 8—7.

The 8—4 machine was operated for a number of months by the employees of A. M.F., and in spite of halts and frequent stoppages it capped perhaps thousands of one-half pint cream bottles in the Borden plant, but no machine of that kind was ever produced commercially, nor did it live out a useful career. The machine was being demonstrated by the manufacturer in the hope of selling it to the Borden Company, and it is fair to characterize this operation, which continued for about a year, as experimental; and further, that the purpose it served was to encourage the manufacturer to redesign the machine in the effort to turn out a device that would be commercially operable in the milk purveying industry. Youngdahl puts it this way: "I suggested that the machine be entirely redesigned along lines which I was able to determine during the time I was down there (the Borden plant) overcoming some of the inconveniences in the operation of the machine," etc.

The foregoing is consistent with minutes of a meeting held December 3, 1924, of officers and associates of the A.M.F. in evidence, which read in part:

"The meeting discussed the question of the milk bottle capping machine under test at Borden's plant, and received the report from Mr. Gwuinn (now deceased—interpolated) on same, and indicated it would probably be necessary that a radical redesign be made of this machine in order to operate successfully."

Youngdahl was employed in the engineering department of the A.M.F. during these years, and is the patentee named in a patent which has been discussed.

It is unnecessary to assign a place in the art to the unperfected and unsuccessful 8—4 machine, standing alone, and as if nothing had been done to project it into the 8—7 machine, since the plaintiff does not refute the evidence that the latter embodied the former, with certain structural changes.

This means that the 8—7 machine may be considered as a later embodiment of the elements of the 8—4 with alterations and modifications which did not introduce new mechanical principles.

In October, 1925, the designing of the 8—7 was started, and by September, 1926, the machine itself was built.

Thereafter about thirty of such machines were manufactured and sold to dairies, mostly on or near to the Pacific Coast, and were operated with daily stoppages for adjustment and repairs, until 1929 or 1930.

It is clear from the evidence that the 8—7 machines were not successful, and that the ones that were sold were eventually discarded and abandoned, although one found its way into the Museum of the Standard Cap & Seal Co., of which photographs are in evidence.

The Lakewest Corporation became a subsidiary of A.M.F. for the purpose of these machines, and by April 30, 1929, it showed a debit balance to the parent company of $1,406,381.81. One year later all assets were transferred to Standard Cap & Seal Co. for 6,000 shares of the stock of the latter, of undisclosed value. Those assets consisted of patents, caps on hand, machinery and various parts.

So far as this record reveals, the history of the 8—7 machine was thus brought to a close. Whether this transaction was entered into in the hope of gain, or to decently inter that which was more of a nui-

sance than otherwise, must be left to conjecture.

The changes made in the 8—7 machine as compared to the 8—4 have been clearly shown in testimony which was not disputed, and may be thus summarized:

(a) The crimping heads did not move down upon the bottles, but were held rigidly in a fixed horizontal plane; the bottles were raised into the crimping heads by mechanical means that permitted of adjustment depending upon the size of the bottles to be capped; that is to say, the bottle supports were adapted to the requirements for raising quart bottles, for instance, a shorter distance than one-half pint bottles. In the 8—4 machine, the heater, and the cold and hot cap transfers were also adjustable vertically according to the different heights of bottles to be capped, while those elements in the 8—7 machine operated in a fixed horizontal plane.

(b) The heater element was disposed vertically, and rotated upon a horizontal instead of a vertical axis according to the 8—4 machine.

(c) The cold cap magazine was a one-stack affair, the bottom cap being moved into the heater by mechanical action, in place of the four-stack rotating cold cap magazine of the 8—4 model.

(d) The bottle detector so functioned that, if no cold cap was started into the heater due to the absence of a bottle to actuate the necessary impulse, the heater continued to rotate, but with a supply of caps that was less than complete by the number of unoccupied cap holders within the heater. This means that no caps were overheated by reason of the failure of the cold cap transfer mechanism to maintain a constant supply of cold caps.

(e) The bottle conveyer moved constantly to supply bottles for capping, and to remove those that had been capped, not intermittently as in the 8—4 machine.

Mr. Trotter's testimony was not contradicted, to this effect: "Functionally, the only difference that I can see in the two machines is in the operation of the bottle detector or skip cap mechanism."

That is mechanically the equivalent of the similar element shown in the 952 patent and discharges the same office.

It seems unnecessary to discuss the changes that were made in the heating plate which carried the caps around in the heater element of the 8—4 machine, which were rendered necessary by the warping of that device. First it was thickened to about 3/4″ and then reduced to 5/16″, and warping was overcome by rollers above and beneath. The redesign of the heating element was rendered necessary in part by the operating hazards of the first form of heater, but it is thought that there is no essential difference between a fixed heater having a rotating member, and a heater which itself revolves upon an axis; nor between one which is vertically disposed and one that occupies a horizontal position.

There are obvious structural differences between the machines disclosed in the three patents in suit, and the 8—4 and 8—7 machines, but if they embody different mechanical principles, or if they disclose essential differences in function, such differences have eluded the efforts of the Court to discern and describe them.

 The critical question in connection with the 8—4 and 8—7 machines is whether the evidence shows them to have constituted more than an "experiment, imperfect and never perfected * * *" (Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, at page 635) and thus to have enriched the prior art.

More persuasive than the testimony of officials and engineers who participated in the design and production of the machines, is the word of those who observed their performance in daily operation:

Marzullo, a machinist who ran three of the 8—7 machines at the Jersey Farm Dairy Co. in Los Angeles in 1927, said that after installation by Mancuso of the A. M.F. the machines caused lots of trouble:

"Q. What were those troubles you were having? A. Well, for one thing, the heating of the caps, bottles hanging up in the crimper, falling off, breaking the bridge (the cap-transfer plate), the centering fingers were bent, the pusher fingers were also bent and numerous other minor troubles too numerous to mention."

He went on to explain the over and under heating of the caps in the heater, and the necessity for stopping caused thereby, with its accompanying loss of production; and that the hanging of bottles in the crimper would result in breakage and loss of milk.

If the caps were not flat, the feeding mechanism would clog, the clutch mechanism would be thrown out, and the feed would be damaged.

He said there were several breakdowns every day and there were no days on which no breakdown occurred. That these machines were finally sold for junk at $25.00 each.

English, Chief Engineer of the Adohr Milk Farm, Los Angeles, and who installed one 8—7 machine for his then employer in 1929 (there being one already in operation at that time) said:

"Q. Did you ever have anything to do with the Westlake hood capping machine? A. Yes Sir.

"Q. Tell us what your first introduction to that machine was? A. At the time I was working for Refrigerating Equipment Corporation, I installed one of the machines and assisted in the installation of several others * * *.

"Q. Did you have any trouble with the Westlake machines? A. We had considerable trouble.

"Q. What was the nature of the trouble? A. We had trouble with bottle breakage, trouble with caps, and trouble with machine parts breaking."

Breakage occurred in the crimper heads, in the star wheel (the bottle portal, so to speak, for entrance to the capping position) and other parts of the machine. Shutdowns due to bottle breakage would occur several times an hour.

These two machines were discarded in 1930.

It is unnecessary to quote further testimony on this subject, and which seems to accord with that touching the performance in 1926 of the 8—7 machine at another Borden plant, in Brooklyn.

 I incline strongly to the view that, even if the real underlying fault lay with the Westlake caps, the fact is that the 8—4 and the 8—7 machines were never carried to such a complete development that they continuously functioned as they were designed to.

If a distinction is proper between a machine which could and did function spasmodically and under constant expert nursing, on the one hand, and a machine which was designed and built to run continuously and to perform a commercial service in the day by day requirements of an important industry, and failed to do so, then such a distinction is clearly revealed in this record.

It will not suffice to argue that the 8—4 and 8—7 machines could have been adapted to the pre-formed flaring skirt cap with which the patentees' machines were designed to perform; I should suppose that the answer would be, that since the 8—4 and 8—7 machines were demonstrated to be inadequate in design and construction to accomplish their appointed task, it is idle to contend that manifestly they could have done something else successfully.

There is another aspect of this question, which has not been discussed by counsel, and perhaps there is good reason for the omission:

Trotter testified that the 8—7 machine, as first built, is shown in the Rundell patent, granted May 15, 1934, on application filed April 7, 1926. It is a tedious document, containing 77 claims and 36 drawings for a "Machine for Crimping Plastic Caps on Bottles". Perhaps it is a fair inference that it was granted over the earlier patents 073 and 075 because not deemed to have been anticipated by them.

If that is so, it is at least plausible to conclude that the respective disclosures of Rundell, and these two patents in suit are not in conflict, and that therefore the 8—7 machine (Rundell) cannot be thought to anticipate 073 and 075.

The conclusion now reached is not put upon that ground; the subject is alluded to merely to indicate that the action of the Patent Office in passing the Rundell application is thought to be not inconsistent with the view here taken, which is that the disclosure embodied in the 8—4 and 8—7 machines was not so far perfected as to become a part of the "stock of knowledge of the art in question" (Picard v. United Aircraft Corporation, supra); namely, the art of the progressive heating and capping of containers of liquids.

Anticipation therefore of all three patents in suit is not deemed to have been demonstrated by the evidence concerning the 8—4 and 8—7 machines.

### Infringement

It has seemed proper to consider the question of validity in this case prior to that of infringement, as the teaching of Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, at page 330, 65 S.Ct. 1143, seems to prescribe.

From what has been said it will appear that all claims of the first two patents involving moldable caps are subject to dismissal on the merits, so far as infringement is concerned, namely, 4, 10, 22, and

35 of the 073 patent, and 17, 18, 19, 24, and 26 of the 075 patent.

There remain claims 24, 26, and 28 of the 073, 12 of the 075, and 1, 2, 3, 5, and 25 of the 952 patent to be disposed of, and decision as to them is not required, unless the Court has incorrectly decided the questions of validity.

It would be inconsistent to find infringement against the defendant of invalid patents (Grant Paper Box Co. v. Russell Box Co., 1 Cir., 151 F.2d 886, at page 890) and therefore the following is written to indicate what the findings would have been, had the question of validity gone otherwise. Perhaps it is a labor of supererogation, and is performed only from what may be a misguided sense of duty.

The defendant's machine is the subject of a trial stipulation which contains photographs completely illustrating the structure, and its operation is described by witnesses who fully and carefully explained all parts and their functions. It will be sufficient to say that defendant's machine comprises the now familiar progressive and continuous cap-feeding, and heating means; and means to bring bottles continuously under a cap-applying station; the latter is the terminus of the exit from the heater and conveyer in which the caps are heated and delivered in position to rest on the top of bottles continuously moving forward to receive them; the bottle carrying a heated cap then moves into a cap-compressing head, by the action of which the cap is laterally compressed into locking position; also the bottle is then held by the capping head through one revolution of the capping head turret, at the completion of which the capped bottles continuously move out in the course of discharge.

The cold caps bear upon their skirts a strip of adhesive, and that strip is heated and rendered sticky in the heating device, and no other part of the cap is heat treated. The cap, being sticky as to its skirt portion, is compressed as stated, and held in the capping head while the adhesive cools and locks the skirts into engagement.

The defendant's capping process differs from those heretofore considered, but that does not affect the question of infringement; the difference lies in this: There is no inner plug which is inserted prior to capping; instead, the bottles are filled at a filling unit, and are then ready to receive the defendant's cap, which has a depressed center nearly as large as the inner circumference of the bottle neck. Such a cap is Ex. I attached to the trial stipulation.

The said center portion of the cap engages the inner circumference of the bottle neck and when the cap has been locked into final form through the compressing action of the capping head and the cooling and binding action of the adhesive strip on the skirts of the cap, the closure of the bottle has been completed. No one argues that infringement is avoided by this difference in the structure of the caps, since that subject is not an element of any claim. Nor is argument made as to the difference in mechanical construction of the cap-skirt contracting or compressing elements of the defendant's machine as compared with any of those disclosed in the plaintiff's patents.

### 073 Patent

Since the moldable claims are withdrawn, the issue is narrowed down to the purely mechanical elements disclosed in claims 24, 26, and 28. The former has been explained above, and is not essentially different from either of the others.

The defendant's machine comprises all elements of these claims; it produces the same result as that of the machine disclosed by the claims in suit, and in substantially the same way. That is, the defendant's structure infringes these claims.

### 075 Patent

Claim 12 alone is involved in the question of infringement. Only so much of that claim as reads as follows need be quoted:

(b) "a cap holder adapted to successively receive said hood caps from said magazine and detachably hold each cap with its open side down and its flexible skirt depending in the path of movement of a container head whereby such container head enters and removes said cap from the holder with the cap centered on the container head with its flaring flexible skirt depending around said head;"

If the cap holder as shown in the photo, Trial Stipulation C, be compared with the showing of Fig. 1 of this patent where cap A is held in position to be removed by bottle C, it will be apparent that infringement by the accused machine is unmistakable. Otherwise, as is candidly stated in defendant's trial brief: "The principle of operation as defined in this claim is present in defendant's machine."

The difference in the degree of tilt of the cap, if there is any, does not avoid the plaintiff's charge, and infringement is present.

### 952 Patent

The claims in suit are 1, 2, 3, 5, and 25.

■ The first three and the last will be considered in one group, and claim 5 separately. For ready reference claim 2 is copied and is typical of the other three:

"In hood capping machinery, in combination,

(a) "a heating oven;

(b) "constantly moving . mechanism for carrying and simultaneously exposing to the heat of said oven a plurality of paper material hood cap disks provided with a binder to render them moldable while constantly advancing a procession of said disks and successively discharging moldable disks for delivery at a hood capping station;

(c) "means for delivering hood cap disks one at a time from a supply to said mechanism for replenishing the supply of moldable disks and for ultimate delivery at said hood capping station to meet an advancing container for which said disk is predestined;

(d) "mechanism for advancing a succession of containers to be hood capped successively at said hood capping station in timed relation to the disk delivering operation of said means, whereby each container and a moldable hood cap disk will be brought together at the hood capping station; and

(e) "a container detector controlling the disk delivering operation of said means to prevent delivery of a disk to said first mechanism when no container to receive said disk after being rendered moldable, is advancing in its proper order in said succession of containers."

The debatable subject-matter is confined to the expression "mechanism for carrying * * * a plurality of paper material hood cap disks provided with a binder to render them moldable * * *". The argument is that defendant's disks are not rendered moldable, but merely sticky by the exposure to heat of the strip of adhesive on the skirt; that the latter itself is not affected by the heat and never becomes moldable, but that the adhesive alone is the active agent in holding the pleats of the skirt into close engagement, once they have been compressed into that relation in the cap securing heads.

If the argument is understood, it means that the capping heads of the defendant's machine would compress its cold unheated caps into position for pleat engagement as effectually as it does with reference to heat-treated caps, but the effort would fail because the adhesive strip would not have been rendered operative. Perhaps that is true, and perhaps it means that the cold caps are just as moldable as those that have been heat treated. This seems, however, to confuse the constituency of the caps, with the machine disclosed. So far as I can discover, the defendant's machine could and would function if the caps described in these claims were treated by it, and if there is testimony to the contrary, it has evaded my reading of the record; nor is there reference thereto in the defendant's briefs. The claims now being discussed are each deemed to read on the defendant's structure, whereby infringement follows.

■ Claim 5, however, embodies a fundamental mechanical characteristic not embodied in the defendant's machine. It is:

"In combination; a heating oven; a continuously traveling conveyer for carrying, spacing and constantly advancing a plurality of hood cap disks in said oven with their skirt portions exposed to the heat thereof to render the same temporarily moldable and to maintain a supply of such disks in a moldable condition; means whereby temporarily moldable disks from said conveyer are successively delivered in a moldable condition at a container hood capping station; *and a feeder for successively delivering cold hood cap disks to said conveyer in timed relation to the travel thereof, and without retarding the continuous advance of the conveyer.*" (Italics supplied)

The emphasized portion of this claim is disclosed in so much of the structure as reveals a linkage through gears of the cap carrier through the heater to the cap supply, so that they are mechanically associated, and are advanced or retarded in the same pace and automatically.

That feature is not present in the defendant's structure. The testimony is clear and uncontradicted that the time of travel through the heater in the defendant's machine is a constant, and cannot be changed except by the substitution of a new gear ratio in this element of the structure.

There is no mechanical association between it and the cap supply in the sense that a change in one is automatically reflected in the other. It is true that the cap call is adjustable within limits to a change in the pace of filled bottles being started toward the cap receiving station, but the plaintiff has demonstrated no timed relationship between the feeding of cold caps and the speed of the conveyer, i. e., the heating time of each cap which according to the testimony is about constant, i. e., five seconds.

It would seem that this must be so, in a practical sense, since a given linear strip of adhesive, disposed on the skirt of a cap of constant circumference, would seem to require a constant exposure, if the intensity of the heat treatment is also constant. If that is varied according to circumstances, of course the time of exposure would be suitably adjustable, but that is not the subject-matter of this discussion.

Infringement of claim 5 has not been demonstrated.

From the foregoing, it will appear that the complaint must be dismissed, and the defendant must have a decree on its counterclaim on the ground that the plaintiff's patents are invalid for want of patentable invention, with costs to be taxed. Findings are filed herewith.

Settle decree.